UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| UNITED STATES OF AMERICA, | |
|---|---|
| -v- | 11 Cr. 1032-79 (PAE) |
| JUAN MARTINEZ, | OPINION & ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

The Court has received a request from defendant Juan Martinez seeking his release from United States Penitentiary Leavenworth, Kansas ("Leavenworth") under 18 U.S.C. § 3582(c)(1)(A)(i), in light of the risk that the COVID-19 pandemic presents for inmates there. Dkt. 2540 ("Def. Mot."); Dkt. 2611 ("Def. Mem."); Dkt. 2617 (Def. Reply"). The Government opposes this request. Dkt. 2614 ("Gov't Mem."). For the following reasons, the Court denies the request.

In 2005, Martinez was a member of the Yonkers faction of the Trinitarios Gang. Gov't Mem. at 1. He also associated with members of the related Bronx Trinitarios Gang. *See id.*; Dkt. 2209 ("PSR") ¶ 82; Dkt. 2269 ("Sent. Tr.") at 2. On September 2, 2005, a group of Yonkers Trinitarios members, including Martinez, fought with individuals they believed to be members of a rival Bloods gang. PSR ¶ 83; Gov't Mem. at 1. Specifically, Martinez engaged in a fistfight with Ka'Shawn Phillips, a 16-year-old boy, on Saratoga Avenue in Yonkers after a basketball game. Gov't Mem. at 1. Phillips's brother became involved in the fight, as did one of Martinez's relatives, and the Phillips siblings "got the better of the fight" against Martinez and his relative. PSR ¶ 83; Gov't Mem. at 1–2.

1

The following evening, September 3, 2005, Martinez attempted to retaliate against Phillips. PSR ¶ 84; Gov't Mem. at 2. According to a witness, Martinez emerged from a black Jeep armed with a machete—alongside his brother armed with a bat—and approached Phillips. PSR ¶ 84; Gov't Mem. at 2. Martinez's brother swung the bat at Phillips and missed; Martinez and his brother then chased Phillips and his associate. PSR ¶ 84; Gov't Mem. at 2.

That evening, Martinez, seeking to further retaliate against Phillips, set in motion the events that led to Phillips's murder. Martinez attended a meeting of the "Bad Boys" sect of the Bronx Trinitarios Gang in Van Cortlandt Park in the Bronx. PSR ¶ 85; Gov't Mem. at 2. Martinez informed the Bronx Trinitarios members at the meeting about the fight between the Yonkers Trinitarios and their perceived rival, the Bloods, which took place a day earlier. PSR ¶ 86; Gov't Mem. at 2. Martinez asked the Bronx Trinitarios members for assistance in retaliating for the fight, stating that he and the Yonkers Trinitarios did not want to retaliate themselves for fear that they could be easily identified. Gov't Mem. at 2. Seven to 10 Bronx Trinitarios—including Alexander Toribio and Carlos Urena—volunteered to join in the retaliation. *Id.*

At the end of the meeting, the Bronx and Yonkers Trinitarios organized themselves into two cars travelling to Yonkers. Sent. Tr. at 26. The group was heavily armed, possessing guns, knives, machetes, and a sword. *Id.* at 26–27. Martinez furnished Toribio with a .9 mm firearm, accompanied him in the car, and pointed out Phillips to him. *Id.* Toribio emerged from the car—while the Yonkers Trinitarios waited down the block to avoid recognition—and fired the gun that Martinez had given him at Phillips. *Id.* at 27. The shot wounded Phillips. The other Trinitarios members stabbed and beat Phillips. *Id.* Urena fired the final, fatal shot into Phillips's brain. *Id.*

2

Immediately after the murder, numerous eyewitnesses identified Martinez as the man who had fought with Phillips after the basketball game on September 2, attacked Phillips on September 3, and (as was later proven false) fired the first shots during the murder. PSR ¶ 89. Martinez was charged by state authorities with intentionally murdering Phillips, and, in 2006, a jury in Westchester County Court convicted Martinez of that offense. *Id.*

Years later, as a result of an independent investigation into the Bronx Trinitarios Gang, the United States Attorney's Office in Manhattan determined that the theory under which Martinez had been prosecuted in Westchester was factually flawed. Gov't Mem. at 2–3. Although Martinez had instigated the murder, it was Toribio, not Martinez, who had fired the initial shots at Phillips. Sent. Tr. at 51. The United States Attorney's Office thereafter provided notice of this to the participants in Martinez's state trial, after which Martinez, then serving a 20-year sentence, petitioned for post-conviction relief under 28 U.S.C. § 2254.

On June 2, 2016, while that petition was pending, a federal grand jury in Manhattan indicted Martinez on charges arising from his participation in Phillips's murder, to wit, murder in aid of racketeering and murder through the use of a firearm. *See* Dkt. 1977. On May 11, 2017, pursuant to a plea agreement, Martinez pled guilty to a racketeering conspiracy count brought in a superseding information. *See* Dkt. 2267. As part of the agreement, the Westchester County district attorney agreed to move to vacate Martinez's earlier conviction upon his federal sentencing. In his plea allocution, Martinez admitted to participating in Phillips's murder by instigating the Bronx Trinitarios gang members to kill him. *Id.* at 26–27, 30–33.

At sentencing, held on September 20, 2017, this Court determined that the proper sentence for Martinez was 360 months imprisonment—the bottom of the applicable Guidelines range of 360 months to life imprisonment yielded by Martinez's offense level (40) and criminal

3

history category (VI). Sent. Tr. at 9. Consistent with the plea agreement, the Court subtracted from the imposed sentence the 12 years that Martinez had spent in New York State custody for his conviction for Phillips's killing. The resulting federal sentence was 18 years' imprisonment. *Id.* at 18, 53–54. As of today, Martinez has served approximately half of his 30-year sentence. His projected release date, with good time credit, is September 22, 2031. Gov't Opp'n at 4.

On November 20, 2020, the Court received a *pro se* motion from Martinez seeking his early release due to the COVID-19 pandemic. *See* Def. Mot. On April 16, 2021, Martinez's appointed counsel filed a memorandum in support. *See* Def. Mem. Martinez argues that his release is warranted in light of: the pandemic's pronounced impact on prisons; Martinez's unique vulnerability to COVID-19 due to his obesity and "various health conditions"; the particularly devastating impact of COVID-19 at the Leavenworth facility; Martinez's "efforts . . . to improve himself during incarceration"; the "support [Martinez] can provide for his family" if released; and the possibility that his release would "lighten the burden at Leavenworth." *Id.* at 1–2. Martinez's *pro se* motion attaches letters of support from associates and family members, attesting to Martinez's good character outside and inside prison. *See* Def. Mot.

On April 30, 2021, the Government opposed Martinez's motion. *See* Gov't Mem. The Government first argues that Martinez has failed to show that his case presents extraordinary and compelling reasons for release: Martinez, the Government notes, was offered the Moderna COVID-19 vaccine in March, yet initially refused to receive it, first receiving the vaccine on April 19, 2021. *See id.* at 5–7. The Government also notes that, had Martinez accepted the vaccine when first offered, he would have been fully vaccinated by April 16, 2021 when his counsel's memo was filed, and in any event, Martinez "will be fully vaccinated on or about May 17, 2021," when he was scheduled to receive a second dose. *Id.* at 7. The Government further

4

argues that, even if Martinez could establish extraordinary and compelling reasons, the factors set forth in 18 U.S.C. § 3553(a) disfavor his early release, given Martinez's integral role in the brutal gang murder of a 16-year-old and that more than 10 years remain on the sentence the Court found just.

Under 18 U.S.C. § 3582(c)(1)(A), a court

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The defendant bears the burden of proving that he is entitled to compassionate release under 18 U.S.C. § 3582(c). *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v. Clarke*, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010).

Originally, § 3582(c)(1)(A) did not permit prisoners to initiate compassionate release proceedings, and instead required the Bureau of Prisons ("BOP") to seek such release on their behalf. *United States v. Ebbers*, 432 F. Supp. 3d 421, 422–23, 427 (S.D.N.Y. 2020). But with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress amended the law to allow defendants independently to seek compassionate release from federal courts. *Ebbers*, 432 F. Supp. 3d at 422–23.

Before the First Step Act, Congress had tasked the Sentencing Commission with identifying circumstances that are sufficiently extraordinary and compelling to justify a reduction in sentence. *Id.* at 427 (citing 28 U.S.C. § 994(t)). The Commission did so in U.S.S.G. § 1B1.13

5

and its corresponding commentary. That guidance, *inter alia*, (1) sets out circumstances that present extraordinary and compelling reasons justifying release; and (2) requires that a defendant not be a danger to the community. *Id.* § 1B1.13(1)–(3) & cmt. n.1(A)–(D).

By its terms, however, the Commission's guidance applies only to a "motion of the Director of the Bureau of Prisons." *Id.* § 1B1.13. And the Commission has not updated § 1B1.13 or its commentary to reflect the First Step Act's amendment to § 3582(c)(1)(A) authorizing defendants to move for compassionate release on their own, without the intervention of the BOP. Accordingly, although courts—including this one—had treated the Commission's guidance as applicable to all compassionate release motions, *see, e.g.*, *United States v. Hernandez*, 451 F. Supp. 3d 301, 303 (S.D.N.Y. 2020); *see also Ebbers*, 432 F. Supp. 3d at 428, the Second Circuit has recently clarified that § 1B1.13 "is not 'applicable' to compassionate release motions brought by defendants," rather than by the BOP, and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling" in such cases. *United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020); *see also id.* at 237 ("Neither Application Note 1(D), *nor anything else in the now-outdated version of Guideline § 1B1.13*, limits the district court's discretion." (emphasis added)).

Consistent with *Brooker*, in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons or by its freestanding requirement that the defendant seeking release not pose any danger to the community. Rather, the Court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," 18 U.S.C. § 3582(c)(1)(A)(i), may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release." *Brooker*, 976 F.3d at 237.

6

The parties first dispute whether Martinez's case presents extraordinary and compelling reasons warranting early release. Martinez argues that his health conditions—including obesity and purportedly elevated glucose and A1C levels (92 mg/dL and 5.5%, respectively)—make him uniquely vulnerable to severe illness from COVID-19 infection. Def. Mem. at 7. The CDC lists "obesity" as a substantial risk factor for severe COVID-19 illness. *Id.* Martinez stands around 5'7" tall and reportedly weighs between 220 and 230 pounds, putting him within the weight range of heightened risk to COVID-19 as defined by the CDC. *Id.* at 3–4. However, Martinez's Glucose and AIC levels are at a "normal" level, as defined by the CDC.[1] Martinez also notes, as of April 16, 2021, that Leavenworth has experienced a severe COVID-19 outbreak, with 866 inmates testing positive and two dying as a result of the disease, therefore presenting heightened risk. Def. Mem. at 8. The Government counters that Martinez's asserted health risks do not constitute an extraordinary and compelling reason for release. Martinez, they note, received an initial vaccine dose against COVID-19 in April and was slated to receive a second one in May; his BMI is at the low end for obesity; and the mass vaccination of inmates at the Leavenworth had totally eliminated infections as of April 30, 2021. Gov't Mem. at 6–7.

The COVID-19 pandemic has of course presented an extraordinary danger to the public and has been exponentially more hazardous to inmates. The crowded nature of federal prisons has made them a hotbed for viral spread. It is astounding, and lamentable, that roughly half of prisoners at Leavenworth have contracted COVID-19. Beyond the risks to health, the pandemic has also subjected inmates to far more restrictive conditions of confinement, and has resulted in limits on access to visitors, including family, far beyond what could have been expected at the

---

[1] *See Tests for Type 1 Diabetes, Type 2 Diabetes, and Prediabetes*, CDC, https://www.cdc.gov/diabetes/basics/getting-tested.html

7

time of sentencing. For these reasons, in the past months, courts, including this one, have ordered the temporary release of inmates held in pretrial or presentencing custody[2] and the compassionate release of certain high-risk inmates serving federal sentences.[3]

Martinez's claim that extraordinary and compelling reasons exist for his release is, however, unpersuasive. The spread of COVID-19 at Leavenworth has dropped dramatically.[4] And Martinez has been vaccinated—as of the completion of briefing on this motion, he was due to receive his second shot in mid-May. As the Government notes, even the first dose of the Moderna vaccine that Martinez received via the BOP gave him 80% effective protection against COVID-19 infection; a second, according to the CDC, would confer 90% effectiveness. Gov't

---

[2] *See, e.g., United States v. Chandler*, --- F. Supp. 3d ---, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at *1–3 (S.D.N.Y. Mar. 31, 2020) (granting bail application, under 18 U.S.C. § 3142(i), of defendant charged with being a felon in possession of a firearm); *United States v. McKenzie*, 450 F. Supp. 3d 449 (S.D.N.Y. 2020) (granting bond pending sentencing, under 18 U.S.C. § 3145(c), to defendant who had pleaded guilty to single count of assault with a deadly weapon and had been released on bond); *United States v. Witter*, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, under § 3145(c), to defendant who had pleaded guilty to a narcotics offense); *cf. United States v. Stephens*, 447 F. Supp. 3d 63 (S.D.N.Y. 2020) (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement, while noting that, in the alternative, § 3142(i) would require his temporary release).

[3] *See, e.g., United States v. Wilson*, 16 Cr. 317 (PAE), Dkt. 656 at 4–7 (S.D.N.Y. Aug. 31, 2020) (ordering compassionate release of defendant with heighted vulnerability who had served the substantial majority of his sentence and played a low-level role in a drug trafficking conspiracy); *United States v. Simon*, 18 Cr. 390 (PAE), Dkt. 507, at 5–9 (S.D.N.Y. Aug. 27, 20) (ordering compassionate release of elderly defendant, who had serious medical conditions and played a low-level role in a drug trafficking conspiracy); *United States v. Davies*, No. 18 Cr. 390 (PAE), Dkt. 479 at 4–7 (S.D.N.Y. June 26, 2020) (ordering compassionate release of elderly defendant, who had serious medical conditions and played low-level role in drug trafficking conspiracy); *United States v. Brown*, No. 18 Cr. 390 (PAE), Dkt. 472 at 4–7 (S.D.N.Y. June 17, 2020) (same); *United States v. Jasper*, No. 18 Cr. 390 (PAE), Dkt. 441 at 2–4 (S.D.N.Y. Apr. 6, 2020) (ordering compassionate release of defendant with an immune-inflammatory disease who had served all but 34 days of a four-month sentence).

[4] As of July 6, 2021, there was one COVID-positive inmate. *COVID-19 Cases*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus.

Mem. at 7 nn.8–9. Given this strong protection, and the miniscule case rate at Leavenworth, Martinez's risk of developing a severe case of COVID-19 has been materially reduced, notwithstanding his heightened sensitivity. Whatever the risk that the pandemic earlier presented to Martinez, his risk of grave illness or death today is far lower. It does not, today, present an extraordinary and compelling basis for release.

In any event, even assuming that—from the perspective of COVID-19 risk—compelling and extraordinary reasons existed for Martinez's release, a reduction of Martinez's sentence would be grossly inconsistent with the 18 U.S.C. § 3553(a) factors. The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of the defendant; and the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In particular, given the savagery of the slaughter of 16-year-old Phillips that Martinez instigated, a material reduction of the sentence the Court carefully imposed would disserve those factors.

In its compassionate release motion, the defense focuses on personal characteristics of the defendant. Counsel notes Martinez's reported rehabilitation in prison, as reflected in enhanced commitment to religion and educational achievements. *See* Def. Mem. 9–11; Def. Reply. To the extent true, these developments reflect well on Martinez and are properly considered in connection with a compassionate release motion. However, the Court explicitly weighed Martinez's mitigating personal characteristics at the original sentencing, including his difficult

upbringing, family circumstances, and his rehabilitation efforts during his time in state prison. Sent. Tr. at 43–47. These personal factors influenced the Court's judgment that a 360-month sentence, as opposed to a yet longer sentence, was sufficient to account for the § 3553(a) factors considered together.

These factors, even with the addition of Martinez's reported continued progress while incarcerated, do not come close to justifying a reduction in sentence, given the weighty factors favoring the lengthy sentence imposed. At sentencing, the Court explained that it regarded "just punishment . . . as the single most important consideration" in calculating Martinez's sentence, and that this factor demanded a "very, very long sentence here." *Id.* at 24–25. As the Court noted, Martinez was "personally responsible for the murder, really the slaughter, of a 16-year-old, [Ka'Shawn] Phillips." *Id.* at 25. Martinez engaged in a fight with Phillips, attacked him later with a machete, and then called on Bronx Trinitarios members to retaliate against the boy. *Id.* at 25–26; PSR ¶¶ 82–85. Martinez also supplied an assailant with a gun, guided the attackers to the boy's location, and pointed out the victim. Sent. Tr. at 26–27. The group was armed to the teeth, possessing guns, knives, machetes, and a sword. *Id.* And Martinez knew that a deadly attack was apt to ensue at the hands of his heavily armed associates: He personally gave Toribio the gun used to fire the first shot. *Id.* at 27–28. Instigated by Martinez, the group savagely murdered Phillips, as reflected in autopsy evidence which revealed numerous knife and sword and machete wounds in addition to the fatal headshot. *Id.* at 27. Martinez thus was the "but-for cause" of Phillips's brutal death. *Id.* at 59. And Martinez's decision not to personally join the attack did not reflect reticence or misgivings, but merely a strategic desire not to be identified. *Id.* at 26.

10

Accordingly, the Court concluded, Martinez's actions were "about as wrongful and evil as a crime can be," and "violated the first . . . command of a civilized society, not to kill." *Id.* at 28–29. Although the Court considered the other § 3553(a) factors in imposing sentence, "none [was] quite as influential . . . as the need for just punishment." *Id.* at 38. The factors of specific and general deterrence, and public protection, also favored a long sentence. *Id.* at 38–39. Based on its careful consideration of the § 3553(a) factors as a whole, the Court concluded that a 360-month sentence was sufficient but not greater than necessary to comply with the purposes of § 3553(a).

In light of the above considerations, Martinez's arguments for release halfway through the 30-year term that the Court found minimally necessary are profoundly unpersuasive. It is true that prison time served during the pandemic is harder than during normal times. And were the Court sentencing Martinez today, the rigors presented by incarceration during the pandemic might justify a marginally lower sentence than that imposed. However, a reduction of the scope that Martinez now seeks would badly disserve the interests justifying the sentence imposed. The resulting sentence would mock the interest in assuring that Martinez's punishment reflected the extraordinary gravity of his crime—instigating the retributory bloodbath murder of a 16-year-old who had done no more than disrespect him.

For similar reasons, the Court has denied compassionate release applications by other defendants who had yet to serve the bulk of the sentences the Court had found necessary under § 3553(a), even where such defendants could point to possibly heightened vulnerability to COVID-19. *See United States v. Cueto*, No. 11 Cr. 1032-80 (PAE), 2021 WL 621188, at *5 (S.D.N.Y. Feb. 17, 2021) (denying compassionate release for a defendant who had served only 30% of his sentence where "the need for just punishment pointed towards a very high sentence"

(internal quotations omitted)); *see also United States v. Ortiz*, No. 16 Cr. 439 (PAE), Dkt. 84 at 2, 6–7 (S.D.N.Y. July 6, 2020) (denying compassionate release for 49-year-old defendant with borderline obesity who had served 70% of 84-month sentence for conspiracy to commit Hobbs Act robbery); *United States v. Leon*, No. 15 Cr. 877 (PAE), Dkt. 320 at 5–7 (S.D.N.Y. June 11, 2020) (denying compassionate release for defendant with asthma who had served 60% of stated sentence of 84 months' imprisonment); *United States v. Romero*, No. 15 Cr. 445 (PAE), 2020 WL 2490027, at *1 (S.D.N.Y. May 14, 2020) (denying compassionate release for a defendant without heightened risk of contracting COVID-19 who had served "approximately 54 months of his significantly below-guidelines sentence of 78 months' incarceration"); *United States v. Francisco*, No. 19 Cr. 131 (PAE), Dkt. 416 at 1, 5 & n.5 (S.D.N.Y. June 29, 2020) (denying compassionate release where defendant had served only 60% of his stated sentence).

The Court thus finds both that Martinez's case does not present extraordinary and compelling reasons and that § 3553(a) factors disfavor Martinez's release. The Court therefore denies Martinez's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

SO ORDERED.

*Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: July 7, 2021
New York, New York